GRAND FORKS LUMBER COMPANY v. McCLURE LOGGING COMPANY.[1]

March 6, 1908.

Nos. 15,477—(160).

**Statute of Frauds—Breach of Contract.**

The contract involved in this case provided for the cutting and deliv-
ery to respondents of all the merchantable pine timber standing on cer-
tain lands, not less than nine million feet nor more than twelve million
feet in any one season, to be paid for in part when the logs were banked,
and as driven and delivered. *Held:*

1. Although the time was not limited within which the contract should
be completed, it appears from its face that it was not to be executed with-
in one year from its date, and hence was within the statute of frauds, and
could not be varied by parol evidence.

2. According to the evidence, appellant was not justified in repudiating
its contract to deliver all of the logs cut during the logging season of
1904–1905, upon the ground that respondent was in default in making
payments.

3. It conclusively appears from the evidence that appellant repudiated
the contract on March 30, 1905, and violated its agreements thereunder by
selling and delivering to other parties the greater part of the logs which
it had cut during the logging season then just closed; that such conduct
constituted a complete breach of the contract, and respondent upon dis-
covery thereof was entitled to declare the contract broken as of the date
of discovery; and its right of action for damages for such breach, with
interest, then became complete.

Action in the district court for Washington county to recover $144,-
805.60 as damages for breach of contract. The case was tried be-
fore Stolberg, J., and a jury which rendered a verdict in favor of
plaintiff for $78,405.18. From an order denying defendant's motion
for a new trial, it appealed. Affirmed.

*J. N. Searles* and *J. C. Nethaway,* for appellant.

*Clapp & McCartney* and *Manwaring & Sullivan,* for respondent.

LEWIS, J.

March 24, 1899, appellant entered into a contract in writing with
Robert H. McCoy, whereby it agreed to cut and remove from certain

[1] Reported in 115 N. W. 406.

described lands all the merchantable pine timber, and to haul, bank, and drive the logs to Crookston, Minnesota, upon the Red Lake river. The contract recited that seven million feet had already been cut and banked during the logging season of 1898–1899, and was to be driven and delivered at Crookston during the driving season of 1899. "Hereafter said party of the first part agrees to cut, haul, bank, drive, and deliver not less than nine million (9,000,000) feet, board measure, of such logs. And if the said party of the second part, on or before the first day of August in any year (commencing with the first day of August, 1899), notify said party of the first part that he will require it to haul, cut, bank, drive, and deliver more than nine million feet of such logs during the next succeeding season, specifying the excess so required, the said party of the first part hereby agrees to cut, haul, drive, and deliver such quantities of said logs as may be required by said party of the second part, not, however, exceeding twelve million feet in any one year." The contract further provided that appellant would use all reasonable diligence to deliver all the logs cut in any one logging season as soon as practicable after the commencement of the first driving season thereafter. Mr. McCoy agreed to purchase all of the pine timber fit for merchantable saw logs standing on the land described "during the continuance of this contract, and to pay for such timber, when cut into saw logs and driven and delivered to him at Crookston aforesaid, eight and $^{50}/_{100}$ dollars ($8.50) per thousand feet, board measure, according to the scale thereof to be made as hereinafter provided, payments to be made as follows." Then follow provisions for the payment of $2.50 per thousand feet, board measure, for all logs cut in the year 1899, as soon as they were cut and banked, and one dollar per thousand feet for all logs banked prior to the first day of January in any year, commencing with the first day of January, 1900, and on the first day of February in each year, commencing with the first day of February, 1900, and one dollar per thousand feet for all logs banked during the preceding January, and, further, when the camps break up in the spring, Mr. McCoy should pay an amount which, together with the amounts previously paid in any one season, should equal $2.50 per thousand feet for all logs cut and banked during the season immediately preceding. There was another provision that he was to pay a certain amount

each year after the logs had been delivered at Crookston. The contract further recites:

"It is understood that the said party of the second part purchases said logs for the purpose of manufacturing the same at the mill to be erected by him at or near East Grand Forks, upon said Red Lake river, below Crookston; and it is mutually agreed that if said party of the second part shall be unable, after exercising all proper diligence, to get substantially the entire cut of said logs in any one season from the point where the same may be delivered to him by the party of the first part pursuant hereto to his said mill, the last four payments to be made for such logs which he may be so unable to get in any one season shall be deferred until he shall be able, exercising all proper diligence, to get such logs to his mill, and thereafter the payments so deferred shall be made in three equal payments as follows: One at the time the logs are substantially delivered at his mill, one in sixty days, and one in ninety days thereafter."

McCoy assigned the contract to respondent, and this action was brought to recover damages alleged to have accrued by reason of the fact that during the year 1905 appellant cut and sold a large quantity of timber to other parties and entirely failed to deliver the same to respondent in accordance with the terms of the contract. Respondent recovered a verdict.

1. One of the principal questions presented on the appeal is that the contract was not within the statute of frauds, and consequently parol evidence was admissible to prove that its terms had been modified. It was alleged in the answer that the original contract was modified, so as to provide that appellant was relieved from the duty of delivering to respondent that portion of the timber located east of a certain ridge, but that the terms of the contract should remain in force as to all of the timber located west of the ridge, with certain modifications in the payments. Appellant also claimed that the contract was modified so that respondent agreed to receive and pay for twelve million, instead of nine million, feet to be cut and delivered during the winter of 1903–1904. All parol evidence offered on the part of appellant tending to change the terms of the contract was rejected by the trial court upon the ground that it tended to change the terms of the contract which was within the statute of frauds.

As we understand the argument of appellant, it is that no time being stated in the contract within which the contract must be performed, it might be performed within one year, and hence was not within the statute of frauds. It is unnecessary to follow appellant through the various propositions bearing upon this subject. To our minds there is no ground for argument. It is perfectly plain from the face of the contract, when considered as a whole with reference to the subject-matter, that it was a contract not intended to be performed within one year from its date. According to the evidence the lands described in the schedules attached to the contract contained merchantable pine timber amounting to upwards of seventy seven million feet. The contract was executed on March 24, 1899. If the contract was to be performed within one year from that date, all of the logs would have to be cut and delivered prior to March 24, 1900. The time for driving logs is in the spring and summer seasons, and the winter season is for cutting and banking logs. This appears from the contract itself. The contract recites that seven million feet had already been cut and banked during the logging season just closed, to be delivered as a part of the contract as soon as practicable after the commencement of the driving season in the year 1899. That several logging and driving seasons were contemplated is evident from the frequent reference throughout the contract to the manner and time of payment, based upon the cut and delivery of the logs for each season. It also appears from the amount to be cut and delivered in any one season. The minimum of nine million feet and the maximum of twelve million feet in any one year were not inserted for the exclusive benefit of appellant. Those provisions were evidently inserted for the benefit of both parties. Appellant was compelled to deliver each year at least nine million feet, and respondent was compelled to receive and pay for that amount. But in addition thereto respondent had the right to call upon appellant to cut and deliver twelve million feet in any one year. If that amount was required, appellant was required to furnish it, but had no authority to compel respondent to receive any greater amount in any one year.

It follows that the contract was within the statute of frauds, in that its execution required more than one year from its date, and consequently its terms could not be varied by parol evidence. The follow-

ing cases, among others, cited by appellant, have been considered: Farwell v. Tillson, 76 Me. 227; Hinkle v. Fisher, 104 Ind. 84, 3 N. E. 624; Sarles v. Sharlow, 5 Dak. 100, 37 N. W. 748; McPherson v. Cox, 96 U. S. 404, 24 L. Ed. 746.

2. Appellant admitted that it had sold to another party all of the logs cut on the lands lying east of the ridge, but attempted to justify its conduct in so doing upon the ground that prior to that time respondent had violated the terms of the contract by failing to make payment of the logs already cut, in accordance with its terms. According to the original contract, appellant was to deliver all of the logs to respondent at Crookston; but subsequently, on July 14, 1904, it was modified in writing, as follows:

"Witnesseth: The party of the second part [respondent company] hereby agrees to drive to Crookston, Minn., all of McClure Logging Company's logs, so called, * * * which were driven out of Sandy river this season and delivered at the outlet of Red Lake in Red Lake river. For the driving of said logs the party of the first part [appellant company] agrees to pay to the party of the second part forty-five cents per thousand feet, board measure, when the said logs are so driven or accepted as driven to Crookston by the said second party. It is further agreed that when the said logs are so accepted as driven by the party of the second part that they, the party of the second part, will accept and pay for all the said logs, as per a certain contract for the purchase and sale of said logs and now in effect between the parties to this agreement. * * * "

The original contract provided that one dollar per thousand feet should be paid for all logs banked prior to the first day of January in any year, commencing with the first day of January, 1900. There is a dispute between the parties as to when the several payments were to be made. The defaults which appellant charges are stated in the summary of its briefs as follows: During the winter of 1903–1904 appellant cut and banked a total of 14,279,660 feet. Respondent paid the banking payments on 12,000,000 feet. The balance should have been paid when the camp broke up in the spring of 1904. In any event the banking payments on the difference, 2,279,660 feet, should have been paid January 1, 1905, so that at the time respondent made the first sale of logs to the Smith Timber Company on March 30,

1905, appellant was in default in the sum of $5,699.15. In addition to this, the logs driven under the contract of July 14, 1904, should have been paid for January 1, 1905, but were not paid for until after the sale of the logs to the Smith Timber Company, and, further, that these defaults continued until after the time of the second sale of logs to the Smith Timber Company, viz., October 3, 1905.

To meet this charge of delinquency in the payments, respondent contends that there is no evidence in the case to show that the logs covered by the contract of July 14, 1904, were accepted as driven, and in any event that the later contract was not intended to modify the first as to the time of payment. The former contract provided that appellant should deliver and that respondent should accept and pay for nine million feet each year, and that the Sandy river logs which were driven under the 1904 contract did not constitute a part of the nine million feet. In any event, says respondent, conceding that the time of payment was somewhat uncertain, and that some payments may have been delayed, yet appellant being aware that it was itself in default, and not having informed respondent that it had assumed to repudiate the contract and sell the logs to other parties on account of any such delay, and the payments having been made in good faith in the course of business, that respondent cannot be charged with having repudiated its contract. During the correspondence which took place, and in making out accounts, appellant sent a statement, August 29, 1905, crediting respondent with the forty five cents per thousand for driving the logs referred to in the July, 1904, contract. On September 5 the respondent remitted the amount which it claimed to be due, but ignored the reference to the Sandy river logs. This amount was accepted by appellant without protest, and thereafter subsequent payments were made on the fifteenth day of October, November, and December, which were received without protest. Appellant wrote to respondent on another matter October 19, 1904, and added by way of postscript: "And, by the way, there is quite a lot of money coming to McClure Logging Company since October 5th. They are paying interest on large amounts. Please see that they get what was due the 5th inst." At the time this letter was received by respondent, the payment referred to in the letter had already been remitted. It is evident that there was not a clear understanding as to when the

logs referred to in the July, 1904, contract were to be paid for. Appellant insisted they should be paid for when driven during the season of 1904, and sent a statement to that effect; but respondent claimed that its original contract had not been modified in that respect.

Conceding, therefore, that there was a dispute between the parties as to the time those logs should be paid for, and conceding, also, that under the original contract respondent was late with the payments, at least to the extent of several thousand dollars, at the times appellant sold the logs to other parties, was the delay in making those payments of such a character as to evince an intention on the part of respondent to repudiate the contract, and thus justify appellant in repudiating its contract?

Upon this branch of the case appellant requested the court to instruct the jury that if they should find from the evidence that respondent, under the contract of July, 1904, either did drive, or in the exercise of reasonable diligence could have driven, the Sandy river logs to Crookston, then a verdict should be returned for appellant. Several other requests were made covering the proposition that respondent could not recover in case the jury should find it was in default in making the payments as stated. The requests were refused. We are of the opinion that the trial court correctly disposed of this matter. There is no evidence that respondent intended to repudiate its contract. Whatever delay may have taken place in the payments grew naturally out of the condition under which the parties were doing business. Respondent was evidently proceeding in good faith and within its legal rights. There is nothing in the record to indicate that appellant sold the logs to other parties for the reason that respondent was in default in the payments. Indeed, it is apparent that appellant sold the logs to other parties for other reasons, having no reference to respondent's conduct in the business.

3. On the question of damages the court charged the jury that respondent was entitled to recover the difference between the $8.50 per thousand feet on 14,779,010 feet, and such price per thousand feet on the same amount as according to the evidence any solvent purchaser could have gotten in the territory tributary to Crookston, and contracted for the future delivery of that amount of logs of substantially the same quality and character, and interest upon the amount

of such difference from the first day of October, 1905, less certain credits. On the thirtieth day of March, 1905, appellant sold to other parties 9,178,280 feet. At that time it had cut 1,258,430 feet, which it had not sold, but which was not delivered to respondent during the driving season of 1905. On March 30, 1905, there was left standing timber amounting to 4,500,000 feet. This timber was sold to other parties, subsequent to March 30, but it does not distinctly appear in the evidence at what date it was sold. The objections of appellant to the rule of damages as given by the trial court disappear when the contract is considered in connection with the acts of the parties.

As we have already stated, the contract contemplated that all of the logs cut during any logging season should be delivered to respondent at Crookston during the following driving season; the object being to supply their mill at Grand Forks with a continual supply of logs until the whole amount covered by the contract should be exhausted. The contract was entire, although arranged so that the payments should be made in instalments. Now, on the thirtieth of March, 1905, appellant had cut over ten million feet, ostensibly for the purpose of driving and delivering the same to respondent during the ensuing season; but, instead of doing so, it sold 9,178,280 feet to other parties, and according to the evidence received an amount largely in excess of the amount they would have received, had they delivered the logs under the contract. Under all the circumstances, when this fact was discovered by respondent, it was justified in assuming that appellant had repudiated the contract and did not intend to deliver any more timber thereunder. In view of all the circumstances of the case, the fact that about four million feet still remained standing March 30 furnishes appellant no ground for the assertion that it had not violated the contract as an entirety. The breach of the contract was deliberate, and the right of action upon the breach became complete as of that date. That the damages were properly assessed by the trial court will appear from the rule adopted in the following cases: Ennis v. Buckeye Publishing Co., 44 Minn. 105, 46 N. W. 314; Bowe v. Minnesota Milk Co., 44 Minn. 460, 47 N. W. 151; Bolles v. Sachs, 37 Minn. 315, 33 N. W. 862; Horst v. Roehm (C. C.) 84 Fed. 565; Roehm v. Horst, 91 Fed. 345; and Id., 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953.

As to interest, it was properly allowed as from the date of the breach as declared by respondent. Interest is proper by way of damages in cases where the demand is unliquidated, provided its pecuniary amount does not depend upon any contingency and is ascertainable by computation or by reference to the generally recognized standards such as the market value. Swanson v. Andrus, 83 Minn. 505, 86 N. W. 465, where the rule is stated. Nesbitt v. St. Paul Lumber Co., 21 Minn. 491; Varco v. Chicago, M. & St. P. Ry. Co., 30 Minn. 18, 13 N. W. 921.

Affirmed.