71   89
84  171

</div>

BARNEY THOMPSON v. CHICAGO, ST. PAUL & KANSAS CITY RAILWAY COMPANY and Another.[1]

January 6, 1898.

Nos. 10,850—(214).

**Evidence—Judgment in Former Trial in Favor of Another Defendant Not Admissible—Collision between Trains at Railway Crossing—Personal Injuries—Negligence.**

In an action brought against two railway companies to recover for personal injuries alleged to have been caused by their concurrent negligence, the defenses interposed by each of the companies were a denial of negligence on its part, and an allegation of contributory negligence on part of the plaintiff. The trial resulted in a verdict in favor of one company, on which final judgment was entered, and in a verdict against the other company, which was set aside and a new trial granted. *Held*, that on the second trial the judgment in favor of the first company was not admissible in evidence in favor of the latter company to prove the contributory negligence of the plaintiff.

[1] Reported in 73 N. W. 707.

Same—Contributory Negligence of Locomotive Fireman—Charge to Jury—Damages—Reduction of Verdict.

> The injury was caused by a collision at a grade crossing between two trains, on one of which the plaintiff was locomotive fireman, and the contributory negligence charged against him was the failure to keep a proper lookout for trains on the other road. *Held* that, as against such other road and upon the particular facts of this case, it was not error for the court to charge the jury that the plaintiff was not bound, in the exercise of ordinary care or in the performance of his duties, to anticipate that the engineer of the other train would recklessly violate his duties under the law in respect to passing a crossing; that, in the absence of evidence to the contrary, he had a right to assume that such engineer would obey the law in that respect. Also, that under the evidence the question of plaintiff's contributory negligence was for the jury. Also, that the damages awarded were excessive. Order affirmed on condition that plaintiff consent to a reduction of the verdict to $6,500.

Action in the district court for Mower county against the Chicago, St. Paul & Kansas City Railway Company, the Chicago Great Western Railway Company and the Chicago, Milwaukee & St. Paul Railway Company to recover damages for injuries suffered by plaintiff while employed as fireman upon a locomotive of the Milwaukee Company. The facts are given in the opinion. Upon the second trial before Whytock, J., and a jury, the plaintiff had a verdict for $10,500 against the Kansas City Company, after a stipulation in open court dismissing the case as to the Great Western Company. From an order of the court denying a motion for a new trial, in case plaintiff would consent to a reduction of the verdict to $8,000, which consent was given, defendant Kansas City Company appealed. Reversed, unless plaintiff consent to a further reduction to $6,500.

*Dan. W. Lawler* and *French & Wright*, for appellant.

If the plaintiff by a diligent use of his senses could have avoided the collision which produced his injury, such failure was, under the existing circumstances, contributory negligence; and if the contributory negligence of the plaintiff was established by the uncontroverted facts of the case, it was the duty of the trial court to instruct the jury as prayed for. Sheiber v. Chicago, 61 Minn. 499; Abbett v. Chicago, 30 Minn. 482; Missouri v. Moseley, 6 C. C. A. 641;

Railroad v. Houston, 95 U. S. 697; Schofield v. Chicago, 114 U. S. 615.   It was plaintiff's duty to continue his watch of the Kansas City train, and to use his senses while crossing the place of danger, as well as when approaching it.   Rogstad v. St. Paul, 31 Minn. 208; Kelly v. Duluth, 92 Mich. 19;  Pratt v. Chicago, 38 Minn. 455; Kansas v. Stoner, 2 C. C. A. 437.

Plaintiff's only excuses for his gross neglect of duty are:

(1) That he had to put in coal; but while watching for the approach of a train on another road it was negligence for him to stop his watch to put on coal and the excuse is frivolous.   Sweeney v. Minneapolis, 33 Minn. 153.

(2) That he had a right to presume that the engineer on the Kansas City train would not attempt to make the crossing, as the evidence tends to show that the Milwaukee train had the right of way.   But in this case the presumption is destroyed by the fact that the plaintiff was in danger, and it was the plaintiff's duty to continue to watch.   For the plaintiff not to exercise this measure of carefulness is to fall below the standard that men call "ordinary care."   Beach, Cont. Neg., § 39;  Texas v. Young, 60 Tex. 201; Greenwood v. Philadelphia, 124 Pa. St. 572;  Davey v. London, L. R. 11 Q. B. Div. 213.

It was error to exclude the judgment roll in favor of the Milwaukee Company in the first action, for one of the issues and defenses litigated upon the trial so far as the Milwaukee Company was concerned was the defense of contributory negligence, and upon all the issues litigated the jury found in favor of the Milwaukee Company and judgment was entered upon that verdict.   Our contention is that as the defense of contributory negligence was one which was complete, and a perfect defense as to either or all of the defendants, and as that defense was found true by the general verdict, the plaintiff was concluded thereby.   In an action of tort, where the action is joint and several, and the plea of one of the defendants shows that the plaintiff could have no cause of action against any of them, if the verdict is against the plaintiff it operates to the benefit of all.   2 Black, Judg. § 780;  Williams v. McGrade, 13 Minn. 39 (46);  Featherston v. President, 71 Hun, 109;  Hill v. Bain, 15 R. I. 75, 2 Am. St. Rep. 873, and note.

It may be claimed that, as there were two defenses interposed by the Milwaukee Company, namely, (a) That the defendant was not negligent, and (b) that plaintiff was guilty of contributory negligence, it was impossible to tell on which defense the Milwaukee Company was successful. Our answer to this is that where there are several defenses interposed, any one of which is sufficient to defeat the action, and a finding in favor of defendant upon all of them, each becomes res judicata. Freeman, Judg. § 276a; Sheldon v. Edwards, 35 N. Y. 279; Merchants v. Lyon, 12 Fed. 63; Rhoads v. City, 144 Ill. 580; Hall v. Zeller, 17 Or. 381; White v. Simonds, 33 Vt. 178; Day v. Vallette, 25 Ind. 42.

The instruction of the court that in the absence of any evidence to the contrary the plaintiff had a right to assume that the servants of the Kansas City company would obey the law in respect to passing a crossing was error. Baker v. Pendergast, 32 Oh. St. 494; Lynch v. Metropolitan, 112 Mo. 420; Payne v. Chicago (Mo.) 31 S. W. 885; Weller v. Chicago, 120 Mo. 635; Philadelphia v. Stebbing, 62 Md. 504.

*S. D. Catherwood* and *John A. Lovely*, for respondent.

The relative rights of the plaintiff and the Kansas City Company are not parallel to the rights of a traveler in a wagon meeting an engine and train at a highway crossing, for in the latter case the train has the preference and right of way, and it is the duty of the wagon to wait for the train. Continental v. Stead, 95 U. S. 161. Furthermore, it has been held that where a foot passenger was about to cross a street and a car stopped just before reaching the crossing, each expecting the other to wait, and then both started so nearly together that a collision became unavoidable, it was a question for the jury. Cleary v. Pittsburgh, 179 Pa. St. 526. The trial judge in his charge clearly stated the law applicable to the relative duties of plaintiff and the servants of appellant's train, and under these instructions properly left it for the jury to determine whether the plaintiff was in any respect wanting in ordinary care, and if so they were directed to find against him. Eich v. Taylor, 17 Minn. 145 (172); Linn v. Rugg, 19 Minn. 145 (181); Farrell v. Waterbury, 60 Conn. 239.

Respondent had passed this and other crossings many times, acting upon a confidence that others would at such hazardous places be mindful of the care which they too, as well as he, should exercise; he was subordinate to his engineer to whom he promptly gave notice of the stoppage of the other train, and his conduct was doubtless influenced by the action of the engineer, in the belief that it was not his duty longer to continue his watch under the supposition that others would violate their duty. Chicago v. Chambers, 68 Fed. 148. Respondent was not bound to assume, in the absence of anything to excite his suspicion, that, when his own engine was so near the crossing and could be so plainly seen, the Kansas City train would run into his train after it had stopped for the crossing. Loucks v. Chicago, 31 Minn. 526; Pratt v. Chicago, 48 Minn. 455; Gray v. Philadelphia, 24 Fed. 168; Cincinnati v. Clark, 57 Fed. 125; Birmingham v. Jacobs, 101 Ala. 149.

The first trial of this action, which was originally brought against both the Milwaukee and Kansas City railway companies, resulted in a verdict in favor of the Milwaukee Company and against the Kansas City Company. It is not evident how a verdict against a joint defendant in tort can be construed into an adjudication in its favor. The theory that one of several defenses of the Milwaukee Company, viz., that of contributory negligence, was by the general verdict established in favor of both defendants is too subtle to prevail against the express findings of the jury by its verdict against the Kansas City Company. The effect of appellant's contention would be to repeal the statute allowing judgment to be entered against one of several defendants upon a verdict against him alone (G. S. 1894, § 5207, subd. 3), and to subordinate one essential part of a verdict to another. The entire finding of the jury must be considered and substantial effect given to every part of it. Newell v. Houlton, 22 Minn. 19; Dempsey v. Cogswell, 29 Minn. 100; Pevey v. Schulenburg, 33 Minn. 45; Clark v. City, 38 Minn. 487; Schneider v. Chicago, 42 Minn. 68; Warren v. Westrup, 44 Minn. 237; Fort Worth v. Mackney, 83 Tex. 410.

In connection with the other instructions given, respondent was entitled to have the jury informed that he need not assume that the servants of the Kansas City Company would violate their duty.

Loucks v. Chicago, supra; Newson v. New York, 29 N. Y. 383, 390; Ernst v. Hudson, 35 N. Y. 9; Pratt v. Chicago, supra; Donohue v. St. Louis, 91 Mo. 357; Langan v. St. Louis, 72 Mo. 392; Birmingham v. Jacobs, supra.

MITCHELL, J.

This action was brought against the Chicago, Milwaukee & St. Paul Railway Company, hereafter called the "Milwaukee Company," and the Chicago, St. Paul & Kansas City Railway Company, hereafter called the "Kansas City Company," to recover for personal injuries alleged to have been caused by the concurrent negligence of the two companies resulting in a collision of trains at the Taopi crossing of the two roads. While the record does not show the fact, it is conceded that one of the defenses interposed by both companies was the contributory negligence of the plaintiff, who, at the time of the collision, was fireman on the train of the Milwaukee Company. On the first trial the court, in substance, instructed the jury that, if plaintiff was guilty of contributory negligence, he could not recover against either company. That trial resulted in a verdict in favor of the Milwaukee Company, upon which judgment was entered, and a verdict against the Kansas City Company, which was subsequently on appeal set aside, and a new trial granted, because of error in the charge of the court. 64 Minn. 159, 66 N. W. 265. A second trial of the action, against the Kansas City Company alone, resulted again in a verdict against that company, and from an order denying a motion for a new trial it appeals.

The collision occurred about four o'clock, on a dark and foggy morning in October, between a freight train on the Milwaukee road going west and a passenger train on the Kansas City road going north. At this point the two roads cross each other at grade and nearly at right angles, the Milwaukee road running east and west and the Kansas City road running north and south. There was a "stop board" on the Milwaukee road about 698 feet east, and on the Kansas City road 414 feet south, of the crossing. The principal duty of the plaintiff was to "fire," and on a freight train this requires a large part of a fireman's time; but it was also part of his duty to assist the engineer in keeping a lookout for other trains at

crossings. It was also his duty to see that the headlight on the engine was replenished with oil and lighted before the train started out.

The evidence tended to show that on the occasion in question the Milwaukee train arrived first, and came to a full stop, with the cab of the engine just opposite the stop board. The engineer was seated on the right-hand or north side of the engine, while the plaintiff was on the left-hand or south side, which was his post of duty when not engaged in firing. After having thus brought his train to a full stop, the engineer gave the usual crossing signal, two short whistles, and started his train, the plaintiff keeping a lookout on the Kansas City road to the south. When the train had moved about 100 feet the plaintiff saw the Kansas City train coming, and so informed the engineer, who inquired if it was going to stop, to which plaintiff replied that he did not know, as it was then too far off. The engineer then shut off steam, and plaintiff continued to watch until he saw the Kansas City train come to a stop at or near its stop board. By this time the head of the Milwaukee train was nearly half way between the stop board and the crossing. He informed the engineer of the fact that the other train had stopped, and then went to putting in coal, and did not look again until he had finished firing, when his engine was almost at the crossing, and the Kansas City train was almost on them, and struck the engine about the middle of the boiler. When the engineer was informed by plaintiff that the Kansas City train had stopped he again gave the starting signal, put on steam and started up, and had attained a speed of about seven or eight miles an hour when the collision occurred. There was nothing to prevent the engineer from looking to the south, and seeing the Kansas City train coming. While the plaintiff was engaged in firing he could, by standing up and turning around, have also seen the coming train.

By the rules of the road the Milwaukee train had the right of way, and it was the duty of the Kansas City train to stop until the other train had passed the crossing. There was nothing, unless it was the darkness, to prevent those in charge of the Kansas City train from seeing the Milwaukee train. There is some conflict in the evidence as to whether the headlight on the latter was burning; but

as the smokestack was emitting a large amount of live sparks, and as a bright light was emitted every time the plaintiff opened the door of the firebox to put in coal, the evidence is practically conclusive that, if those in charge of the Kansas City train had looked, they would have readily seen the Milwaukee train.   Indeed, it appears that passengers on the Kansas City train, who were at a greater distance than those on the engine, had no difficulty in seeing it and did see it.   In fact, the gross negligence of those in charge of the Kansas City train is hardly questioned.

The negligence charged against the plaintiff is:   First, not keeping the headlight burning; and, second, not continuing to watch the Kansas City train, even after it stopped, until the Milwaukee train had reached the crossing.

As to the first, all that is necessary to say is that the evidence was, at most, conflicting.   The evidence seems to be undisputed that the headlight was burning when the train started on its trip, and during the trip, up almost to the time the train reached the crossing; the conflict being as to whether it was still burning at, and immediately before, the time the collision occurred.   Whether it was still burning, or, if not, whether that fact contributed to the accident, were, under the circumstances, questions for the jury.

The evidence as to the second specification of contributory negligence also made a case for the jury.   It must be borne in mind that this is not a suit between the Milwaukee road and a passenger, to whom it owed the highest degree of care, but an action by the plaintiff against a third party, as to whom the standard by which his conduct is to be measured is that of ordinary care.   The plaintiff had seen the Kansas City train come to a stop.   He had notified his engineer of that fact, who was in a position to see the train, and who must have known that plaintiff had ceased to watch, and gone to putting in coal.   The plaintiff also knew that his train had the right of way.   He had no reason to suppose that those in charge of the Kansas City train would not see his train, and conform to the rules by stopping until it had passed the crossing.   Whether, under these circumstances, plaintiff was guilty of contributory negligence in not continuing a lookout was for the jury.

2. The defendant further claims that the judgment in favor of

the Milwaukee Company was conclusive, in favor of the defendant, that plaintiff was guilty of contributory negligence; and the action of the trial court in excluding the judgment roll, when offered in evidence for that purpose, is assigned as error.   This contention hardly requires discussion.   In the first place, it does not appear that the verdict in favor of the Milwaukee Company was based on the contributory negligence of the plaintiff.   On the contrary, in view of the charge of the court, the fact that the verdict was in favor of that company, but against the present defendant, necessarily implies that the jury found that plaintiff was not guilty of contributory negligence.   Moreover, estoppels must be mutual; and, if the verdict had been against the Milwaukee Company, it would hardly be claimed that it would have estopped the Kansas City Company from alleging and proving that plaintiff was guilty of contributory negligence.

3. At the request of the plaintiff the court instructed the jury that he

"Was not bound, in the exercise of ordinary care or in the performance of his duties, to anticipate that the engineer or servants of the Kansas City Company would recklessly injure or violate the duties which they owed to him under the law in respect to passing the crossing.   In the absence of any evidence to the contrary, he had a right to assume that the engineer of the Kansas City train would obey the law in that respect."

This is assigned as error.   This instruction is aimed at the fact that the plaintiff ceased his lookout after he saw that the Kansas City train had come to a standstill at or near its stop board.   As applied to the particular state of facts disclosed by the evidence, and stated in the first part of this opinion, there was no error in this instruction.   It was right in line with the instructions given by the court at defendant's request, particularly the eighth and eleventh, regarding the conduct of its own servants.   Counsel likens the case to one where a traveler on an ordinary highway is about to cross a railroad crossing at grade, where it has been frequently held that the traveler has no right to rely implicitly on the assumption that an approaching train will give the required signals and neglect to use his own senses of sight and hearing.

71 M.—7

But the two cases are not at all parallel. As between the traveler on an ordinary highway and a railroad train, the latter has the right of way. In the case of these two trains, that of the Milwaukee Company had the right of way. Those operating trains have to do so in accordance with a code of rules. They do not, and cannot, communicate with each other by word of mouth in order to determine which train shall cross first. The plaintiff had seen the Kansas City train come to a standstill at its stop board, and had communicated that fact to his engineer, who had entire control of the movements of the train, and who could have further watched the movements of the Kansas City train had he deemed it necessary. Plaintiff further knew that his train had the right of way, and had no reason to suppose that the Kansas City train would not wait until it had passed the crossing. In ceasing to keep a lookout and in resuming his duties of firing, plaintiff was not bound, in the exercise of ordinary care, to anticipate that those in charge of the other train would disregard the rules.

If plaintiff had been employed on a passenger train, where his employer owed the highest degree of care to its passengers, and this was an action by an injured passenger against the Milwaukee Company, it might be difficult to sustain the instruction; for it would be an unsafe doctrine to hold that those intrusted with the safety of passengers might, at so dangerous a place as a grade crossing of two railroads, without keeping any lookout themselves, implicitly assume that those operating trains on the other road would obey the rules. But as already suggested, in this action against a third party, the test by which plaintiff's conduct is to be measured is merely that of ordinary care. Moreover, the instruction complained of did not imply that plaintiff had a right to assume that those in charge of the Kansas City train would, in any event, discover the Milwaukee train. It went no further than to state that he had a right to assume that they would not recklessly disregard the rules.

4. The only remaining question is whether the damages awarded are excessive. The verdict was for $10,000, which the trial court reduced to $8,000, as a condition to a denial of defendant's motion for a new trial. The plaintiff was at the time of the trial a young

man about 29 years of age, and at the time of his injuries was earning about $70 a month as fireman on a locomotive engine.   Prior to this time his health had been good.   The principal apparent injury was to his right hand.   The thumb and index finger were so mangled and torn that they had to be amputated, together with what is called the metacarpal bone of the thumb.   The metacarpal bones of the wrist, eight in number, which play an important part in the movement of the wrist, were so affected that all the movement which the wrist has is an up-and-down movement, limited in degree, between the wrist bone and the long bones in the arm.   The skin and much of the tissue on the back of the hand was destroyed, and the whole back of the hand is now covered with "scar tissue," which grows so close to the bone that it is very sensitive to heat and cold, and further weakens the strength of what remains of the hand.

The plaintiff was subject to medical treatment and was confined to his bed or house for six weeks or more.   During this illness he was, as the probable consequence of his injuries and exposure at the time of the accident, attacked with pleurisy, which has resulted in some adhesions of the pleural lining, which, however, according to the medical testimony, is very common, and not usually serious or dangerous, unless they are so extensive as to bind the lung down to the chest walls, and thus interfere with its breathing capacity. The plaintiff received some other external cuts and bruises on different parts of his body, but none of them were at all serious.   No bones were broken except those in the thumb and finger, already described.   According to his testimony, he has ever since the accident, which occurred about four years before the trial, been subject at times to pains in his side and back, and to distress from flatulency of the stomach after eating; also to some irritation of the urethra or the bladder, resulting in a desire to urinate frequently; also that he has lost flesh, and feels weak and nervous; that he had none of these symptoms before he was injured.

He also testified that he was unable to do any work to amount to anything for over a year after the accident.   In the fall of 1892 he went South, and was engaged in running a steam riding gallery until the following May or June.   He then went to work for the Milwaukee Company in "dispatching engines," which was light

work, but at which he admits that he earned as much, or more, per day as he did when employed as fireman. He was engaged in this work from October, 1893, to September, 1895, and during that time worked 579 days. This was partly or mainly night work. Since he left the service of the Milwaukee Company he has not been engaged in any regular employment. Since the first few weeks after the accident, during which he was under regular medical treatment for the injuries to his hand, he has neither been under, nor applied for, medical treatment, except an occasional prescription for his dyspepsia or stomach trouble.

There was a considerable amount of medical expert evidence given by those who had carefully examined his physical condition. Most of this was characterized by a degree of intelligence, candor and lack of partisanship not always found in testimony of that kind. One of these experts gave his opinion that most of the symptoms of which plaintiff complained did exist, that they were caused by the accident, and that they were permanent. This opinion was necessarily based in part on what the plaintiff told him. But the general trend of the medical testimony was to the effect that his lungs, kidneys, and other organs were all in a sound and healthy condition, that his temperature and pulse were normal, and that they could discover no permanent injury or ailment, other than to his hand, except a thickening of the left pleura, with adhesions between the portions of it directly over the lung, and perhaps a slight irritation of either the urethra or the bladder. Of course, the experience of passing through such an accident is liable to produce a nervous shock which will produce functional derangement for a time, and may be so serious as permanently to impair the general health; but the latter result is usually largely a matter of conjecture, or, at most, of opinion founded on a very uncertain basis of fact.

The injury to plaintiff's right hand, which is permanent, and which, according to the opinion of one witness, destroys nineteen-twentieths of its physical capacity, is a very great loss, for which plaintiff is entitled to very substantial damages. He is also undoubtedly entitled to recover for loss of time, pain and suffering, and cost of medical treatment, caused or rendered necessary by his

injuries; but a very careful examination of the whole record has impressed us with the feeling that, beyond this, the evidence furnishes a very uncertain and slight basis of fact for the recovery of damages.

On the first trial the verdict was $8,000, which the trial court reduced to $6,000. On the second trial the verdict was $10,500, which the court reduced to $8,000. We are of opinion that this amount is still excessive. Probably no person would voluntarily submit to such injuries for that amount of money. But, as we have repeatedly had occasion to remark, that is not the basis upon which pecuniary damages are to be estimated in actions of this kind. The theory of the law is to compensate the injured party on a pecuniary basis, so far as money can compensate him at all. Invested at 6 per cent., $8,000 would yield plaintiff an annual income of $480, while the principal would remain intact. At the age of 29 years it would, according to the usual standards of interest and mortality, purchase him a life annuity of over $450. Of course, some allowance should be made for the time that elapsed between the date of the accident and the date of the trial; but, in our judgment, anything in excess of $6,500 would be excessive.

Ordered that a new trial be granted unless plaintiff, within ten days after the filing of the remittitur in the lower court, shall file his consent that the verdict be further reduced to $6,500, in which case the order appealed from is affirmed. Neither party is to be allowed statutory costs.